| | |
|---|---|
| Jane Doe, for herself, and by and through her Parent and natural guardian, Pauline Thomas; John Doe for himself, and by and through Nickole Thomas, his Parent and natural guardian; Pauline Thomas, for herself; and Nickole Thomas, for herself, | Civil No. 08-1198 (DWF/AJB) |

                    Plaintiffs,

v.                                              **MEMORANDUM**
                                        **OPINION AND ORDER**

Dr. Albert Tsai, M.D., in his individual capacity;
Sherrie Murphy, R.N, in her individual capacity;
Sgt. Chris Pickhardt, in his individual capacity;
Laura Hauser, in her individual capacity;
Marjorie Hogan, M.D., in her individual capacity;
Hennepin County Medical Center; and
William Minor, R.N.,

                    Defendants.

---

Jill Clark, Esq., Jill Clark, PA, counsel for Plaintiffs.

Barbara A. Zurek, Esq., Katherine A. McBride, Esq., and Amy L. Maddox, Esq., Meagher & Geer, PLLP, counsel for Defendants Dr. Albert Tsai and Dr. Marjorie Hogan.

Michael B. Miller, Assistant Hennepin County Attorney, Hennepin County Attorney's Office, counsel for Defendants Sherrie Murphy, Laura Hauser and Hennepin County Medical Center.

Sara J. Lathrop and Tracey L. Fussy, Assistant City Attorneys, Minneapolis City Attorney's Office, counsel for Defendant Sergeant Chris Pickhardt.

---

**INTRODUCTION**

This case is before the Court on a Motion for Partial Summary Judgment brought by Plaintiffs Jane Doe, John Doe, Pauline Thomas, and Nickole Thomas ("Plaintiffs"); a Motion for Summary Judgment brought by Defendants Dr. Albert Tsai and Dr. Marjorie Hogan; a Motion for Summary Judgment brought by Defendant Sergeant Christopher Pickhardt; and a Motion for Summary Judgment brought by Defendants Sherrie Murphy, RN; Laura Hauser; William Minor, RN; and Hennepin County Medical Center ("HCMC") (together, the "HCMC Defendants"). For the reasons set forth below, the Court grants Defendants' motions and denies Plaintiffs' motion.

**BACKGROUND**

**I.      The Parties**

Plaintiff Pauline Thomas is the mother of Jane Doe, and through this lawsuit makes claims for both herself and Plaintiff Jane Doe. Plaintiff Nickole Thomas is Pauline Thomas' daughter and the mother of Plaintiff John Doe. Nickole Thomas makes claims for herself and her son, Plaintiff John Doe. R.N.T. is Pauline Thomas' grandson. R.N.T.'s mother is Rhonda Thomas, who, at the time of the relevant incident, lived in Milwaukee. A.L. and D.T. are Pauline Thomas' grandchildren and children of Rhonda Thomas.

Defendant Doctors Albert Tsai and Marjorie Hogan are physicians who practice at HCMC.[1] They are employed by Hennepin Faculty Associates ("HFA"), an independent contractor that provides medical services, such as the provision of contracted doctors, to HCMC. (Decl. of Jill Clark in Supp. of Plts.' Mem. of Law Supporting Mot. for Partial Summ. J. ("Clark Aff."), ¶ Ex. 21 (Dep. of Larry Kryzaniak ("Kryzaniak Dep.")) at 11-12.) Drs. Tsai and Hogan are deemed to be on the staff of HCMC, but are actually employees of HFA. (Kryzaniak Dep. at 11.) In 2004, HCMC was a department of Hennepin County and has since become a subsidiary of Hennepin County. (Kryzaniak Dep. at 7-10.) Defendants Sherrie Murphy, William Minor, and Laura Hauer[2] are registered nurses employed by HCMC. Sgt. Chris Pickhardt is a member of the Minneapolis Police Department.

## II.    Hospital Protocol

HCMC has a Protocol for Pediatric Sexual Assault that applies to all premenarchal females and all females and males twelve years and under who arrive at the emergency room in one of the following situations:  when a pediatric patient arrives at the emergency room with a report of sexual contact that occurred within 72 hours prior, or with report of genital injury/bleeding of unknown etiology or suspected abuse/assault. (Aff. of Katherine A. McBride ("McBride Aff.") ¶ 14, Ex. 15 (the "Protocol")).  In such

---

[1]    HCMC is doing business as Hennepin Healthcare System ("HHS").  For the sake of clarity, the Court continues to refer to HHS as HCMC.

[2]    While the case caption and docket sheet list Laura Hauser as a defendant, it appears that the correct spelling of her last name is Hauer.

cases, the Protocol requires the emergency room physician to evaluate the patient and, based on the findings, to consider a colposcopic exam (an exam using a lighted magnifying instrument with a recording device that is placed approximately 18 inches from the patient's perineal area) with the assistance of a Sexual Abuse Response Service (SARS) nurse and/or forensic collection. (Protocol at 2-3.) The Protocol also provides that the physician may contact a member of the Child Maltreatment Physician Consult Team ("CMPCT"), a team of physicians who are specially trained in child-maltreatment evaluations. (McBride Aff. ¶ 11, Ex. 10 (Dep. of Marjorie Hogan, M.D. ("Hogan Dep.)) at 34, 36-37.) Dr. Hogan is a member of CMPCT. The Protocol also covers the "Waiver of Medical Privilege and Authorization of Release of Medical Information for Victims of Assault." (Protocol at 11.) The Protocol provides in pertinent part:

**Obtain authorization for the medical-legal examination.**

    a.  Have the care giver [sic] sign the "Waiver of Medical Privilege and Authorization of Release of Medical Information for Victims of Assault".

    b.  If the caregiver refuses and this is believed to be a case of sexual **abuse**, have the medical provider note the refusal by the caregiver and sign and proceed.

(*Id*.) The Protocol further provides that if the child is medically stable but either living with the alleged perpetrator or the caregiver is unable to keep the child safe from the alleged perpetrator, the physician is to seek a 72-hour Police Health and Welfare Hold. (*Id*. at 6.) In addition, the Protocol provides that a physician should seek a hold if a child's injury or illness requires hospitalization and the caregiver refuses. HCMC also has a policy regarding "Refusal of Recommended Treatment and/or Leaving Against

Medical Advice." (McBride Aff. ¶ 15, Ex. 14.) This policy provides that, with respect to minors, a physician or nurse shall place a 72-hour hold if a parent or legal guardian's decision to discharge a minor patient against medical advice or their refusal of a treatment significantly threatens a child's health or well-being. (*Id*.) The Protocol further indicates that a court order to provide a necessary medical procedure or treatment may be necessary. (*Id*.)

## III.    The Relevant Events

On the morning of July 14, 2004, Pauline Thomas brought her then ten-year old daughter, Jane Doe, and several other children to HCMC. Thomas arrived at the HCMC emergency room at approximately 5:30 a.m. The medical forms indicate that Thomas brought Jane Doe to the emergency room because of a "possible sexual assault." (McBride Aff. ¶ 14, Ex. 13 ("Jane Doe Medical Records") at 16, 21.) On the previous night, five children were staying with Pauline Thomas in her Minneapolis home. (McBride Aff. ¶ 2, Ex. 1 (Dep. of Pauline Thomas ("Thomas Dep.")) at 28, 55.) These children included Jane Doe and four of Pauline Thomas's grandchildren, including R.N.T. and John Doe.[3] (*Id*. at 56-60.) Thomas registered all of the children as patients and originally sought to have all of them examined. (McBride Aff. ¶ 12, Ex. 11 (Dep. of Sherrie Murphy ("Murphy Dep.)) at 75, 117; McBride Aff. ¶ 19, Ex. 18.) Murphy started her shift at 7:00 a.m. and volunteered to assist in the care of the Thomas family. She

---

[3]    Pauline Thomas had four daughters, including Rhonda, Nickole, and Jane Doe. Pauline Thomas' daughter Rhonda has five children, including R.N.T., D.T., and A.L. Pauline Thomas' daughter Nickole has three children, including John Doe.

worked with them periodically from approximately 7:30 a.m. until 2:00 p.m. (Murphy

Dep. at 91-92, 94-95,178.) Murphy's notes from that time state, in part:

> Note: pt was brought in by mom for eval of possible sexual assault. mom's 13 y/o grandson [R.N.T.] just came to live with family 4 days ago. Mom/grandma has been aware of 13 y/o having issues with being sexually assaulted himself and sexually assaulting others in the past. 1 year ago, mom/grandma found [Jane Doe] and [R.N.T.] together, both with their pants down and [R.N.T.] behind [Jane Doe] "humping." Not sure if penetration occurred at that time, but had [R.N.T.] move out of house and back to Milwuaki [sic] immediately. Last night all the kids were supposed to go to bed around midnight, mom fell asleep and woke up around 0400 to find [Jane Doe] laying on the floor in another room "pretending to be asleep". At the time she noted [R.N.T.] to be in the bathroom and heard the toilet flush. . . .

> Note: continued: Mom then checked under [Jane Doe's] clothes to see if [R.N.T.] had done anything to her or not. Mom noted a spot of blood on patient's underwear near the rectal area. Mom then brought all the children to the ED for eval. Pt has not had a period yet. On exam of pt's underwear, a red spot of what looks like blood a little larger than a quarter-size was found on the upper front side of the panties. Mom then realized that underwear was probably on backwards at the time she noted red area to rectal area.

(Jane Doe Medical Records at 21.) Pauline Thomas brought the blood-stained underwear

to the emergency room. R.N.T. was separated from the other children and placed in a

special-care room. (Murphy Dep. at 94-96; Jane Doe Medical Records at 16.) The

medical staff contacted the police and child-protection services. (Murphy Dep. at 96-

98.)[4]

At approximately 6:42 a.m., Officer Timothy Merkel and Sergeant Holly Keegel

were dispatched to HCMC. (Aff. of Timothy Merkel ("Merkel Aff.") ¶ 3; Aff. of Holly

---

[4]     HCMC medical personnel are mandatory reporters under Minn. Stat. § 626.556.

Keegel ("Keegel Aff.") ¶ 3.) The police reports also note the events preceding Pauline Thomas' decision to bring the children to the emergency room. Specifically, the police reports note that at around midnight, Pauline Thomas told the children they could stay up for twenty more minutes. (McBride Aff. ¶¶ 19, 20, Exs. 18 ("Merkel Report"), 19 ("Keegel Report")). Pauline Thomas fell asleep and when she woke up at approximately 3:30 or 4:00 a.m., she noticed that Jane Doe was not sleeping next to her as she was required to do when R.N.T. visited. The police reports indicate that Pauline Thomas testified that she required R.N.T. to sleep downstairs and the other children slept upstairs. (Keegel Report at 1; *see also* McBride Aff. ¶ 8, Ex. 7 (Dep. of Jane Doe ("Jane Doe Dep.") at 60.) Pauline Thomas indicated that she then called for Jane Doe and heard footsteps into the bathroom and the toilet flush. Pauline Thomas reported that she then went into the bedroom and saw Jane Doe pretending to be asleep and R.N.T. exiting the bathroom. Pauline Thomas then found the blood stain on the back of Jane Doe's underwear.

Both the medical and police reports indicate that Pauline Thomas became concerned because of R.N.T.'s past sexual behavior. In particular, the records indicate that Pauline Thomas reported to medical staff that she was aware that R.N.T. had been sexually assaulted himself and that he had sexually assaulted others in the past--including the incident during the previous summer during which Pauline Thomas found R.N.T.

behind Jane Doe "humping." (Jane Doe Medical Records at 21, 22, 25 & 26.) [5]  In

addition, the records indicate that Pauline Thomas reported to Officer Keegel that R.N.T.

had molested his sister when living in Milwaukee and that the assault involved an

allegation of anal sex. (Keegel Report.)  The police records indicate that Pauline Thomas

told police officers that R.N.T. "had been caught attempting to have sex with other

children when he lived with his other grandmother in Milwaukee, WI."  (Merkel Report.)

Murphy spoke with Pauline Thomas regarding the reason why she brought the

children to the emergency room and Murphy reported that information to Dr. Tsai.

(Murphy Dep. at 81-82; Tsai Dep. at 89, 95-98.)  Dr. Tsai informed Pauline Thomas that

he would need to do a medical/evidentiary external gynecological exam on Jane Doe to

determine the source of the blood, rule out emergent medical causes, and determine

whether she was sexually abused. (Tsai Dep. at 112.)  Dr. Tsai and Murphy had several

conversations with Pauline Thomas about the purpose and need for the exam, during

which Pauline Thomas went back and forth from consenting to refusing to the exam.

Pauline Thomas told Dr. Tsai that Jane Doe was sensitive about her body image and

Pauline Thomas did not want to make those feelings worse. (Tsai Dep. at 112.)  Pauline

---

[5]      Pauline Thomas has since denied using the word "humping" but testified during
her deposition that she used the word "jumping." (Thomas Depo. at 108.)  Pauline
Thomas also testified that she does not remember what she told the medical staff at
HCMC when she arrived on July 14, 2004. (*Id*. at 106.)  She did testify, however, that
she did not tell anyone about the 2003 summer incident or that R.N.T. had
inappropriately touched others. (*Id*. at 107.)  Pauline Thomas also acknowledged that she
told the medical staff that R.N.T. had been inappropriately touched in the past. (*Id*. at
112.)

Thomas also told Officers Merkel and Keegel that she was concerned that the exam would be traumatic for her daughter. Sergeant Keegel contacted the Family Violence Unit and told Sgt. Arthur Knight the details of the case. The officers asked Pauline Thomas to ask her daughter what happened that night. Pauline Thomas reported that Jane Doe denied any sexual activity but could not explain the blood on her underpants. Yet Jane Doe also reported that in 2003 R.N.T. attempted to have anal sex with her. (Keegel Aff. ¶ 12.) Pauline Thomas then spoke with A.L., who confirmed that she had been sexually assaulted by R.N.T. in Milwaukee. (*Id*.) Pauline Thomas relayed this information to the officers.

Pauline Thomas then became very apprehensive about having any examination done on Jane Doe. At one point, she stated that she did not want Jane Doe or any of the other children examined. (Merkel Aff. ¶ 9.) She escorted her children out of the hospital to her van that was parked in front of the hospital. The police officers told Pauline Thomas that if she did not agree to the exam, they would place the children under a 72-hour police hold. (Merkel Aff. ¶ 9; Keegel Aff. ¶ 9.) Pauline Thomas then returned to the hospital but told officials that she wanted to speak with her attorney before proceeding with any exams. (Merkel Aff. ¶ 10.) She was given both a phone and a phone book. (*Id*.) After speaking with her attorney, she consented to an external, visual-only exam, but requested that the exam be videotaped. In her deposition, Pauline Thomas testified that she felt that HCMC was working against her family because HCMC had telephoned the police and separated R.N.T. from the other children and, therefore, decided to leave without having the children examined. (Thomas Dep. at

118-22.)  Pauline Thomas also told Sergeant Keegel that she did not want R.N.T. to be arrested.  (Keegel Aff. ¶ 13.)

Sergeant Keegel then contacted the Child Abuse Unit and Sergeant Knight. Defendant Sergeant Pickhardt and Knight came to HCMC.  Sergeant Keegel briefed Sergeant Pickhardt and Knight.  (Keegel Aff. ¶ 15; McBride Aff. ¶ 17, Ex. 16 (Dep. of Sgt. Christopher Pickhardt ("Pickhardt Dep.")) at 66.)  Sergeant Pickhardt also spoke with medical staff about the underlying events.  (Pickhardt Dep. at 67.)  Sergeant Pickhardt explained to Pauline Thomas that the medical examination was to provide for Jane Doe's safety and to ascertain the source of bleeding.  (Pickhardt Dep. at 86-92.) After learning of Pauline Thomas's request that the exam be videotaped, Sergeant Pickhardt called the Child Abuse unit and had a video camera delivered to the hospital.

Dr. Tsai then performed a visual exam of Jane Doe's external perineal and rectal areas.  (Tsai Dep. at 175-76; Jane Doe Medical Records at 25.)  Murphy assisted Dr. Tsai with this exam.  (Murphy Dep. at 122.)  Pauline Thomas videotaped the exam.  During the first exam, the medical records indicate that Dr. Tsai and Murphy observed matted pubic hair and vaginal discharge on Jane Doe.  (Murphy Dep. at 124-26; Tsai Depo. at 160-61; Jane Doe Medical Records at 25, 27.)  They did not observe any apparent tears from the outside.  After the initial exam, Dr. Tsai and Murphy again sought Thomas' consent for a more thorough exam to be performed under conscious sedation.  Dr. Tsai concluded that the second examination was necessary because of an unidentified source of the blood that created a "potential for morbidity and morality."  (Tsai Dep. at 125.) Pauline Thomas waivered and then refused to consent.  (Murphy Dep. at 131.)  Dr. Tsai

then asked Sergeant Pickhardt to place Jane Doe on a 72-hour hold, explaining that it was medically necessary and that Pauline Thomas would not consent. Sergeant Pickhardt placed the children under a protective hold. During his deposition, Sergeant Pickhardt explained that a hold was required:

> Because in viewing the totality of all these circumstances that came in that [Pauline] wasn't providing for the safety of [Jane Doe] just in her medical needs, telling her not to talk to the police and cooperating with an investigation of a child with all the evidence and totality of everything that's been, so far that's been sexually abused, it's absurd that a mother would not want to cooperate with some type of an investigation that if something happened to her child, my God, being raped or sexually assaulted that she wouldn't want to do as much possible for helping her child and getting services to help her child. Just the whole totality of all that brought there I would have been derelict of my duty to not place this child on a hold, absolutely in this case.

(Pickhardt Dep. at 108-109.) At some point, Pauline Thomas was escorted out of HCMC. The parties dispute the circumstances that led to her exit.

Dr. Tsai proceeded with the second, more thorough exam. Dr. Tsai signed the "Medical/Legal Examination Waiver." (Jane Doe Medical Records at 13; Tsai Dep. at 209-210.) Dr. Tsai contacted Dr. Hogan, who was the CMPCT on-call physician. Dr. Hogan arrived in the exam room after Jane Doe was under sedation. (Hogan Dep. at 103-104.) Murphy and nurse Laura Hauer, the SARS nurse, were also present during the examination. Murphy provided sedative medications to Jane Doe. Hauer handed swabs to Dr. Tsai for testing and secured the swabs afterwards. Dr. Tsai examined Jane Doe's perineal and rectal areas both externally. Dr. Tsai also performed a forensic exam, taking swabbed samples for evidence. Dr. Hogan provided medical findings in Jane Doe's medical records:

> I noted debris in the pubic hair area (collected for evidence). As well, the patient had a swollen right labia majora and an oozing, friable tear at the posterior fourchette (extending into the posterior vestibule (approximately 5mm). The hymen was estrogenized with no tears or lesions noted. These findings are consistent with trauma.

(Jane Doe Medical Records at 27.)

John Doe was also examined while under a police hold. Dr. Tsai performed a general examination and visual inspection of his genitalia. (Tsai Dep. at 274; McBride Aff. ¶ 25, Ex. 24 at 4.) John Doe testified during his deposition that swabs were taken during his examination and that something was inserted into his rectum. There is no evidence, however, in the medical records that any swabs or samples were collected from John Doe.

On May 1, 2008, Plaintiffs filed this action asserting various constitutional violations pursuant to 42 U.S.C. § 1983. Specifically, Plaintiffs assert a violation of their substantive due process rights under the Fourteenth Amendment, a Fourth Amendment violation for an unreasonable search and seizure, First Amendment retaliation against Sergeant Pickhardt, a violation of parental rights, and a violation of procedural due process. In addition, Plaintiffs Jane and John Doe allege intentional infliction of emotional distress against all Defendants and breach of a unilateral contract against HCMC.[6] Plaintiffs also assert that the police and medical defendants worked together to

---

[6]    Defendants assert that Plaintiffs' counsel stated on the record before Magistrate Judge Arthur J. Boylan that they would be dismissing their intentional infliction of emotional distress claim. Plaintiffs do not offer any arguments in opposition to the dismissal of this claim. Therefore, Plaintiffs' claim for intentional infliction of emotional distress is dismissed.

search and seize and claim that race played a role in the treatment Plaintiffs received at HCMC.

## DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

# I. Defendants' Motions for Summary Judgment

## A. Sergeant Pickhardt

Plaintiffs assert several claims under 42 U.S.C. § 1983 against Sergeant Pickhardt, including substantive due process, procedural due process, unreasonable search and seizure, and First Amendment retaliation claims. Sergeant Pickhardt asserts that Plaintiffs' Section 1983 claims should be dismissed against him because his actions did not violate any constitutional right and because he is shielded by the doctrine of qualified immunity.

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42. U.S.C. § 1983. Qualified immunity shields government officials from civil liability under Section 1983. *Wilson v. Layne*, 526 U.S. 603, 614 (1999). A defendant is shielded from civil liability if it is shown that his or her "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

On a motion for summary judgment, the Court employs a three-part test to determine whether qualified immunity exists. *Goff v. Bise*, 173 F.3d 1068, 1072 (8th Cir. 1999) (citing *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996)). First, the plaintiff must assert a violation of a constitutional right. *Id.* Second, the alleged right

must be clearly established. *Id.* Third, the plaintiff must raise a genuine issue of material fact as to whether the official would have known that the alleged action violated the plaintiff's clearly established rights. *Id.* "Qualified immunity is available 'to all but the plainly incompetent or those who knowingly violate the law.'" *Avalos v. City of Glenwood*, 382 F.3d 792, 798 (8th Cir. 2004) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (citation omitted).

In § 1983 actions involving alleged interference with the right to family integrity, "it is nearly impossible to separate the constitutional violation analysis from the clearly established right analysis." *Manzano v. South Dakota Dep't of Social Servs.*, 60 F.3d 505, 510 (8th Cir. 1995). Sergeant Pickhardt asserts that Plaintiffs have not asserted a violation of a clearly established constitutional right and cannot demonstrate that no reasonable officer would have believed that the 72-hour hold was lawful given the circumstances Sergeant Pickhardt faced.

### 1.    Substantive Due Process

Plaintiffs assert that Sergeant Pickhardt's actions constitute a substantive due process violation. In order to prevail on a substantive due process claim, Plaintiffs must show "that the government action was truly irrational, that is, something more than . . . arbitrary, capricious, or in violation of state law." *Graning v. Sherburne County*, 172 F.3d 611, 617 (quoting *Anderson v. Douglas County*, 4 F.3d 574, 577 (8th Cir. 1993)). The government action in question must shock the conscience or be otherwise offensive

to judicial notions of fairness and human dignity.  *See Costello v. Mitchell Pub. Sch. Dist.* 79, 266 F.3d 916, 921 (8th Cir. 2001).

While parents have a liberty interest in the "care, custody, and management of their children," that interest is not absolute.  *See Manzano*, 60 F.3d at 510.  The liberty interest is "limited by the compelling governmental interests in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves."  *Id*. at 510.

> Clearly, our precedents provide that, when a state official pursuing a child abuse investigation takes an action which would otherwise unconstitutionally disrupt familial integrity, he or she is entitled to qualified immunity, if such action is properly founded upon a reasonable suspicion of child abuse.

*Manzano*, 60 F.3d at 511.  Plaintiffs assert that Sergeant Pickhardt's  actions "shock the conscience" because John Doe was prevented from leaving the hospital with Pauline Thomas and subjected to a medical/forensic examination without calling his mother, because Jane Doe was subjected to a sedated medical/forensic examination without consent or court order even though both Jane Doe and R.N.T. told the police that nothing happened, because there could be no claim of rape against R.N.T. because he was only thirty-six months apart in age with Jane Doe, and because Pauline Thomas indicated she had "jumped to a conclusion" with respect to her initial concerns about a possible sexual assault.  (Pls.' Mem. Opposing Defs.' Mots. for Summ. J. at 36.)  Plaintiffs also assert "familial relations" claims against Sergeant Pickhardt for placing the 72-hour holds on Jane and John Doe.

Plaintiffs' substantive due process claim against Sergeant Pickhardt centers on the 72-hour hold placed on Jane and John Doe. The hold was placed on the children after Sergeant Pickhardt arrived at HCMC and was apprised of the situation. After arriving at HCMC, Sergeant Pickhardt learned that Pauline Thomas brought five children to HCMC in the early morning because she suspected that R.N.T. had sexually assaulted Jane Doe. Sergeant Pickhardt also learned that Pauline Thomas had reported that: at roughly 3:30 a.m., she woke to find her ten-year old daughter pretending to be asleep on the floor and R.N.T. coming out of the bathroom, despite the fact that R.N.T. was not allowed to sleep on the same floor as the other children; R.N.T. had a history of sexually assaulting children, including his younger sister; during the summer of 2003 Pauline Thomas walked in on Jane Doe and R.N.T. with their pants down and R.N.T. "humping" Jane Doe; R.N.T. had been sexually abused himself; Pauline Thomas discovered a spot of dried blood on Jane Doe's underwear; and Jane Doe had not yet begun menstruating. Sergeant Pickhardt also learned that Pauline Thomas told the police that she did not want R.N.T. arrested and that Pauline Thomas changed her mind and decided she did not want the children examined. Further, Sergeant Pickhardt learned that Pauline Thomas consented to a visual exam of Jane Doe, the results of which indicated possible sexual assault and trauma. In addition, Dr. Tsai indicated to Sergeant Pickhardt that a more thorough examination was required to determine the cause of bleeding and whether there had been a sexual assault. Finally, Sergeant Pickhardt was aware that Pauline Thomas refused consent for the second examination.

Under Minnesota law, a child may be taken into custody by a police officer "when a child is found in surroundings or conditions which endanger that child's health or welfare or which such peace officer reasonably believes will endanger the child's health or welfare." Minn. Stat. § 260C.175, subd. 1(2). Viewing the record in the light most favorable to Plaintiffs, no reasonable juror could conclude that Sergeant Pickhardt violated Plaintiffs' substantive due process rights by placing a hold on Jane and John Doe. Considering the facts presented to Sergeant Pickhardt at the time,[7] a reasonable officer could have believed that he was presented with a situation where Jane and John Doe's welfare was threatened and that a 72-hour hold was lawful. While the decision to place the hold on the children disrupted Plaintiffs' familial rights, when weighed against the government's interest in pursuing suspected child abuse and protecting children believed to be victims of child sexual abuse, the disruption was justified. Sergeant Pickhardt's actions were proportional given the reasonable belief that Jane Doe had been sexually assaulted and the fact that her mother was not consenting to a medical examination. On the record before the Court, it simply cannot be said that Sergeant

---

[7] Pauline Thomas disputes many of the statements attributed to her in both the medical and police records. That she disputes those statements, however, is irrelevant for purposes of the motions before the Court because the proper inquiry involves the information Sergeant Pickhardt was presented with at the time he issued the 72-hour hold. *See, e.g.*, *Lawson v. Hulm*, 223 F.3d 831, 834 (8th Cir. 2000). Plaintiffs have presented no evidence that Sergeant Pickhardt did not believe the facts to be as they are presented in the medical and police records. Nor have Plaintiffs presented any evidence to support their conclusory allegations that the Defendants fabricated the information recorded on July 14.

Pickhardt's decision to place the hold "shocks the conscience" or was "truly irrational."[8] Moreover, even if the disruption of Plaintiffs' familial rights rose to the level of a constitutional violation, Sergeant Pickhardt would be entitled to qualified immunity because his actions were founded on a reasonable suspicion of child abuse. *See Manzano*, 60 F.3d at 511; *see also K.D. v. County of Crow Wing*, 434 F.3d 1051, 1055 (8th Cir. 2006) ("In cases where the rights of the parent are balanced against the State's interest in protecting the child, the qualified immunity defense is difficult to overcome."). Accordingly, Plaintiffs' substantive due process claim fails as a matter of law.

### 2. Procedural Due Process

Plaintiffs also assert that Sergeant Pickhardt violated Jane and John Doe's procedural due process rights by placing a 72-hour hold on Jane and John Doe without notice and a hearing. To succeed on a procedural due process claim, Plaintiffs must demonstrate that there has been a deprivation of a constitutionally-protected liberty or property interest and that the procedures used by the state to effect the deprivation were constitutionally inadequate. *See In re Scott County Master Docket*, 672 F. Supp. 1152, 1169 (D. Minn. 1987.) Procedural due process requires that an aggrieved party be afforded an opportunity to be heard at a meaningful time and in a meaningful manner. *Id.* The process due depends on the nature of the interest at stake. *See Bohn v. County of Dakota*, 772 F.2d 1433, 1435-36 (8th Cir. 1985.)

---

[8] Based on the record before the Court, it appears that it would have shocked the conscience if Sergeant Pickhardt had *not* initiated the hold considering the information he was presented with at the time.

Here, Plaintiffs assert the private interest in the preservation of the family unit. The state interest is in protecting children reasonably suspected of being abused. As explained above, under Minnesota law, a child may be taken into custody by a police officer "when a child is found in surroundings or conditions which endanger the child's health or welfare or which such peace officer reasonably believes will endanger the child's health or welfare." Minn. Stat. § 260C.175, subd. 1(2). A child taken into custody pursuant to Minn. Stat. § 260C.175 is then entitled to a hearing within 72 hours to determine whether the child should remain in custody. Minn. Stat. § 260C.178, subd. 1. John Doe was released to his mother before the need for such a hearing. Jane Doe received an emergency protective-care hearing under Minn. Stat. § 260C.178 on July 19, 2004. (McBride Aff. ¶ 33, Ex. 32.) Once a child is removed from parental custody without a court order, the state bears the burden to initiate judicial proceedings. *See K.D. v. County of Crow Wing*, 434 F.3d at 1056.

Here, Plaintiffs have not filed a claim against the state for failure to provide adequate process. Nor have Plaintiffs made a showing that Sergeant Pickhardt was constitutionally required to provide any additional process before placing the hold on Jane and John Doe. Thus, Plaintiffs' procedural due process claim against Sergeant Pickhardt fails as a matter of law.

### 3. Unlawful Search and Seizure

Plaintiffs assert that Jane and John Doe were unlawfully seized and searched in violation of their Fourth Amendment rights. The Fourth Amendment protects individuals against unreasonable searches and seizures without a warrant supported by probable

cause.  As asserted against Sergeant Pickhardt, Plaintiffs' claim relates only to the alleged

seizure, and not the alleged search, of Jane and John Doe.  (Pls.' Mem. Opposing Defs.'

Mots. for Summ. J. at 2-3.)[9]  Plaintiffs assert that Sergeant Pickhardt was required to

obtain a warrant before the second exam of Jane Doe was performed.  Plaintiffs also

assert that Sergeant Pickhardt had time to obtain a warrant, considering the sedated exam

did not take place until roughly eight hours after Jane Doe arrived at HCMC and that his

failure to obtain a warrant was unreasonable.

As explained above, under Minnesota law, Sergeant Pickhardt could lawfully

place a 72-hour hold on Jane and John Doe if he found the children to be "in

surroundings or conditions which endanger the child's health or welfare."  Minn.

Stat. § 260C.175.  Here, the record reflects that Sergeant Pickhardt was concerned about

the well-being of the children and that there was ample evidence supporting a reasonable

belief that the children's health and welfare were endangered.  Also, as explained above,

even if Sergeant Pickhardt's failure to obtain a warrant constituted a Fourth Amendment

violation, Sergeant Pickhardt is entitled to qualified immunity because he was operating

under a reasonable suspicion of child abuse.

### B.     First Amendment Retaliation

Plaintiffs also assert that Sergeant Pickhardt retaliated against them in violation of

their First Amendment rights.  Specifically, Plaintiffs assert that Pauline Thomas

---

[9]     Plaintiffs point to a chart supplementing interrogatory responses, wherein they
indicate which of Plaintiffs' claims are asserted against each Defendant.  The chart
clearly indicates that Jane and John Doe's Fourth Amendment claims are asserted against
Sergeant Pickhardt for seizure only, and not the search.

exercised her First Amendment rights by refusing to give consent, criticizing police and others at HCMC, and consulting with an attorney. Plaintiffs further assert that in retaliation, Sergeant Pickhardt refused to allow her to leave HCMC with the children (other than R.N.T.), threatened to put the children (other than R.N.T.) on a 72-hour hold and then, in doing so, had Pauline Thomas removed from the hospital and made false allegations against her to make her look like a troublemaker.

In order to establish a claim for unlawful First Amendment retaliation, a plaintiff must show that: (1) he or she engaged in a protected activity; (2) the government official took adverse action that would chill a person of ordinary firmness from continuing in the activity; and (3) the adverse action was motivated by the exercise of the protected activity. *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004). Sergeant Pickhardt asserts that the First Amendment retaliation claim fails as a matter of law because Plaintiffs cannot establish a causal connection between the allegedly retaliatory animus and the deprivations or that Plaintiffs' "speech" was chilled as a result of placing the 72-hour hold.

To survive summary judgment, Plaintiffs must point to facts in the record that show that Sergeant Pickhardt's actions were motivated by retaliation and that the retaliatory motive was a "but for" cause of Plaintiffs' alleged deprivation. *Osborne v. Grussing*, 477 F.3d 1002, 100 (8th Cir. 2007). As discussed above, the record demonstrates that Sergeant Pickhardt had a reasonable belief that Jane Doe had been sexually assaulted and that Pauline Thomas was not acting in the children's best interests. Plaintiffs point to no record evidence that suggests that Sergeant Pickhardt was motivated

by any improper or retaliatory motive.[10]  Plaintiffs' allegations are undermined by the fact that Sergeant Pickhardt facilitated Thomas' contact with her attorney and placed the hold on the children only after he tried to convince Pauline Thomas to consent.  There is nothing in the record that suggests that Sergeant Pickhardt was motivated by retaliatory animus.  Both Pauline Thomas' and Nickole Thomas' First Amendment retaliation claims fail.[11]

### C.    Drs. Tsai and Hogan

Plaintiff asserts that Drs. Tsai and Hogan violated their constitutional rights—in particular Nickole and Pauline Thomas' familial rights under the Fourteenth Amendment and Jane and John Doe's Fourteenth and Fourth Amendment rights.  Drs. Tsai and Hogan argue that they are entitled to summary judgment on Plaintiffs' constitutional claims against them because they were not, as a matter of law, acting under color of state law. Further, Drs. Tsai and Hogan argue that Plaintiffs have not submitted evidence to survive summary judgment on the issue of whether their conduct on July 14, 2004, violated a constitutional right.  In addition, Drs. Tsai and Hogan argue that even if they could be held liable under § 1983, they would be protected by qualified immunity.

---

[10]    Again, Plaintiffs make conclusory and unsupported allegations that Sergeant Pickhardt fabricated allegations against Pauline Thomas to make her look like she was not properly caring for her daughter or the other children, that she was loud and disruptive, and that R.N.T. had committed a criminal sexual assault.  The Court notes that this case is now at the summary judgment stage.  Plaintiffs may not rest on mere allegations.  *Anderson*, 477 U.S. 242, 256 (1986).

[11]    Nickole Thomas' First Amendment retaliation claim fails for the additional reason that she has not alleged that she engaged in any protected activity.

Only persons acting under the color of state law can be held liable under § 1983. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Youngblood v. Hy-Vee Food Stores, Inc.*, 487 U.S. 42, 855 (8th Cir. 2001) (only "state actors can be held liable under Section 1983"). "[T]he state action requirement reflects judicial recognition that 'most rights secured by the Constitution are protected only against infringement by governments.'" *Lugar v. Edmondson Oil*, 487 U.S. 42, 936 (1982) (citation omitted). A private party can be a state actor if "he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Id.*

Plaintiffs assert that Drs. Tsai and Hogan are state actors because they were "clothed with the authority of government and their conduct was made possible only because of their position." (Pls.' Mem. of Law Supporting Mot. for Partial Summ. J. at 29.) In particular, Plaintiffs assert that Drs. Tsai and Hogan worked at HCMC, worked with HCMC nurses and police in the emergency room, were paid by public patients or the government, and were governed by HCMC's policies. Plaintiffs also assert that Drs. Tsai and Hogan acted "in concert" with public officials, such as Sergeant Pickhardt and SARS nurse Hauer, so as to be liable under § 1983. Plaintiffs also argue that although Drs. Tsai and Hogan were technically employed be HFA, they "functioned as an employee of HCMC." (*Id.* at 30.)

Viewing the record in the light most favorable to Plaintiffs, the Court determines that Plaintiffs have failed to put forth evidence that could lead a reasonable juror to conclude that Drs. Tsai and Hogan were acting under color of state law in connection with any of the matters for which they are being sued. Here, Drs. Tsai and Hogan are

employed by HFA, a private medical organization that contracts with HCMC to provide certain medical services. That Drs. Tsai and Hogan worked at HCMC is not enough, alone, to make them state actors. Plaintiffs also assert that because Drs. Tsai and Hogan were paid, albeit through HFA, by public patients or by the government via publicly funded insurance programs, they should be considered state actors. Plaintiffs, however, cite to no compelling authority suggesting that private doctors who receive money from patients receiving treatment in a public hospital or through a publicly funded insurance policy such as Medicare or Medicaid are state actors. Plaintiffs also argue that Drs. Tsai and Hogan acted "in concert" with public officials, such as Sergeant Pickhardt and SARS nurse Hauer, so as to be liable under § 1983. The Court disagrees. Drs. Tsai and Hogan are mandatory child-abuse reporters under Minnesota law. Dr. Tsai requested that the police put the 72-hour hold on the children so that he could continue medical care. He also conducted the SARS examination and collected evidence in accordance with and reliance on hospital policy and Minnesota law. Drs. Tsai and Hogan also provided information and evidence to the police about Jane Doe's case pursuant to state law. Although they were providing information to law enforcement, the doctors do not become state actors simply by operating under a state statute. *See, e.g.*, *Thomas v. Beth Israel Hosp. Inc.*, 710 F. Supp. 935, 940-41 (S.D.N.Y. 1989) (explaining that a private hospital was not acting under color of state law simply because it reported suspected

child abuse under state law).  For these reasons, the Court grants Drs. Tsai and Hogan's motion for summary judgment.[12]

Moreover, even if Plaintiffs had alleged that Drs. Tsai and Hogan were state actors, their claims against them would be fatally defective.  Plaintiffs have failed to raise any genuine issues of material fact to show that Drs. Tsai or Hogan did anything (or failed to do anything) that rises to the level of a constitutional violation.  While the Court acknowledges that Drs. Tsai and Hogan could have, in hindsight, done things differently that perhaps would have more thoroughly addressed the sensitive issue of how and when to proceed with an exam on a minor without consent when the minor is alleged to be a victim of child sexual abuse, Plaintiffs have not demonstrated that there is anything constitutionally actionable about the doctors' decisions.

### D.    HCMC Defendants

#### 1.    Claims against the nurses

As against the HCMC Defendants, Plaintiffs allege the violation of the following constitutional rights:  (1) Jane and John Doe's rights to freedom from unreasonable seizures; (2) Pauline and Nickole Thomas' "parental and family rights"; (3) substantive due process with respect to Jane Doe, Pauline Thomas, and John Doe; and (4) respondeat superior or *Monell* liability against HCMC and a claim of improper policy and custom to

---

[12]    In their opposition to Drs. Tsai and Hogan's motion for summary judgment, Plaintiffs assert that the joint-activity test is met because everyone working in the emergency room and the police were conspiring against them.  This argument, however, does not withstand summary judgment as Plaintiffs have failed to point to any facts in the record to support their conclusory allegations of conspiracy.

prevent warrantless examinations or searches. Defendants Murphy, Hauer, and Minor assert that the claims against them must be dismissed because they were not acting under color of state law, and even if they were, they did not violate any constitutional rights and are protected by qualified immunity. HCMC also asserts that there is no liability on its part.

The Court holds that Plaintiffs' claims against the individual nurses fail as a matter of law. The nurses had very limited involvement in the actual physical examinations that form the basis of Plaintiffs' constitutional claims against them. Further, the record demonstrates that none of the nurses had any significant role in the decision to perform the SARS exam or to place the children on health and welfare holds. Instead, the record establishes that the decision to perform the examinations on Jane and John Doe were made by Dr. Tsai, the attending physician, and that Dr. Tsai actually performed the examinations. The record establishes a more limited role on the part of the nurses. For example, Murphy conducted a medical interview of Jane Doe and a general physical examination, engaged in numerous conversations with Pauline Thomas—during which they discussed the issue of consent to a sexual assault examination of Jane Doe, and assisted in administering medications to Jane Doe during the second examination performed by Dr. Tsai. The record shows that Hauer organized and handled swabs taken for laboratory and forensic purposes during the second sexual assault examination of Jane Doe. The record also shows that Minor entered John Doe's medical history on the Sexual Assault Examination Form, but left the examination portion of the form blank so that a doctor would fill out that portion of the form when he or she did the examination. (Aff.

of Michael B. Miller ¶ 2, Ex. 3 (Dep. of William Minor) at 24-25, 29-30, 79.)  The record

demonstrates that the nurses were acting on the orders of Dr. Tsai, who made all

decisions regarding Jane and John Doe's examinations and prescribed medication.  There

is no evidence that the nurses deviated from Dr. Tsai's orders or from the policies or

protocols of HCMC.  Moreover, there is no evidence that any of the nurses restrained

Plaintiffs or encouraged them to return to the hospital when they attempted to leave.

Indeed, Pauline Thomas testified it was a police officer who followed her outside when

she attempted to leave and told her that if she did not return, the police would place a

hold on her children.  (Thomas Dep. at 124-25.)  Viewing the evidence in the record in

the light most favorable to Plaintiffs, the Court concludes that no reasonable juror could

conclude that Murphy, Hauer, or Minor violated Plaintiffs' constitutional rights.

## 2. *Monell* claim against HCMC

Plaintiffs also claim that the official policy or custom of HCMC violates federal

law.  It is well-established that a governmental entity cannot be held liable under § 1983

on a respondeat superior theory.  *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691

(1978).  Thus, a government body cannot be held liable under § 1983 merely because it

employs a tortfeasor.  *Id*. at 691-92.  For a municipality to be liable under § 1983, a

plaintiff must prove that a municipal policy or custom was the "moving force [behind] [a]

constitutional violation."  *Id*. at 694.  Specifically, a plaintiff must identify a policy that is

constitutionally deficient and must show that employees complied with the policy,

thereby causing a constitutional violation.  *Kuha v. City of Minnetonka*, 365 F.3d 590,

603-605 (8th Cir. 2003), abrogated on other grounds by *Szalba v. City of Brooklyn Park*, 486 F.3d 385 (8th Cir. 2007).

An "[o]fficial policy involves a deliberate choice to follow a course of action . . . made from among various alternatives[ ] by an official who is determined by state law to have the final authority to establish governmental policy." *Ware v. Jackson County, Mo.*, 150 F.3d 873, 880 (8th Cir.1998) (quotations and brackets omitted). Alternatively, a custom "is demonstrated by: (1) [t]he existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) [d]eliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) [t]he plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation." *Id.* (brackets omitted).

Defendants argue that the record is devoid of any proof of an unconstitutional policy, practice, or custom. Defendants further argue that Plaintiffs' expert, Dr. Robert Chabon, offers only an inadequate critique of hospital policy but fails to offer any opinion on the constitutionality of HCMC's policies and no opinion at all on custom or practice. Plaintiffs claim HCMC policy and custom is unconstitutional and, in the alternative, that they are entitled to a ruling that HCMC lacked sufficient policies to

prevent harm. Plaintiffs also move under Rule 56(f) for a continuance to be taken up

only if the Court finds Plaintiffs' evidence of policy or custom insufficient.[13]

---

[13]     In support of the Rule 56(f) motion, Plaintiffs point to the motion to compel
medical data from HCMC defendants, that was heard by Magistrate Judge Boylan on
December 22, 2009. During that hearing, the Magistrate Judge ordered the parties to
meet and confer and to inform the Court of their progress in resolving the discovery
dispute. The parties reached an agreement and, on January 26, 2010, the Magistrate
Judge issued an Order noting that the parties had reached an agreement and denying
Plaintiffs' motion to compel as moot. (Doc. No. 243.) Plaintiffs claim that they never
received the data to which HCMC agreed to provide. In a March 1, 2010 letter to
Magistrate Judge Boylan, Plaintiffs stated that they were entitled to additional data and
explained that instead of "reinitiating" their motion to compel, and because they believed
that they had sufficient evidence to support their *Monell* claim, they would file a Rule
56(f) motion. (Doc. No. 301-2.) HCMC Defendants responded to the March 1, 2010
letter, disputing the accuracy of Plaintiffs' representations and asserting that Plaintiffs'
March 1, 2010 letter was untimely considering that the deadline for discovery, together
with motions relating thereto, had passed. By letter dated March 2, 2010, Magistrate
Judge Boylan indicated that Plaintiffs' motion to compel was fully addressed when the
Court denied it as moot in January 2010, and indicated that any further motions on the
matter are before the undersigned.

Federal Rule of Civil Procedure 56(f) provides:

If a party opposing the motion shows by affidavit that, for specified
reasons, it cannot present facts essential to justify its opposition, the court
may: (1) deny the motion; (2) order a continuance to enable affidavits to be
obtained, depositions to be taken, or other discovery to be undertaken; or
(3) issue any other just order.

Fed. R. Civ. P. 56(f). To request discovery under Rule 56(f), a party must file an
affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how
these facts are reasonably expected to raise a genuine issue of material fact; (3) what
efforts the affiant has made to obtain them; and (4) why the affiant's efforts were
unsuccessful. *Johnson v. United States*, 534 F.3d 958, 965 (8th Cir. 2008).

The Court concludes that Plaintiffs have made an insufficient showing of any
efforts to obtain the requested information and why their efforts were unsuccessful. In
particular, Plaintiffs have not made a showing that they were entitled to the data they now
seek from HCMC under the agreement reached on Plaintiffs' motion to compel. In

(Footnote Continued on Next Page)

With respect to an allegedly unconstitutional policy, Plaintiffs cite to HCMC's Protocol. Plaintiffs claim that the Protocol mandates a violation of parental rights under the Fourth and Fourteenth Amendments and was the moving force behind the alleged constitutional violations. As explained above, the Protocol sets forth different actions for emergency room staff to take depending on the history provided and the injury presented. As an initial step, the emergency room staff, and nurses in particular, obtain past medical history and vital signs, and get "the story" of what happened. In the case of pediatric patient who arrives at the emergency room within 72 hours of sexual contact or with a report of genital bleeding of an unknown source or suspected abuse or assault, the Protocol requires the emergency room physician to evaluate the patient and to consider performing a colposcopic exam and/or forensic collection with a SARS nurse. (Protocol at 2-3.) The Protocol also suggests that the physician contact a member of CMPCT. Dr. Hogan is a member of CMPCT. Dr. Hogan testified that it is critical to collect and preserve evidence during the initial emergency room exam because findings of sexual abuse are rarely found on a child's body more than 24 hours after the event. (Hogan Dep. at 21-22.) The Protocol also covers the "Waiver of Medical Privilege and Authorization of Release of Medical Information for Victims of Assault." The Protocol provides in pertinent part:

(Footnote Continued From Previous Page)
addition, their current effort to obtain additional information is untimely. The discovery issue should have been addressed prior to the discovery deadline. Accordingly, Plaintiffs' Rule 56(f) motion is denied.

**Obtain authorization for the medical-legal examination.**

c. Have the care giver [sic] sign the "Waiver of Medical Privilege and Authorization of Release of Medical Information for Victims of Assault".

d. If the caregiver refuses and this is believed to be a case of sexual **abuse**, have the medical provider note the refusal by the caregiver and sign and proceed.

(Protocol at 11.) The Protocol further provides that if the child is medically stable but is either living with the alleged perpetrator or the caregiver is unable to keep the child safe from the alleged perpetrator, the physician is to seek a 72-hour Police Health and Welfare Hold. (*Id*. at 6.) In addition, a physician should seek a hold if a child's injury or illness requires hospitalization and the caregiver refuses. HCMC also has a policy regarding "Refusal of Recommended Treatment and/or Leaving Against Medical Advice." (McBride Aff. ¶ 15, Ex. 14.) This policy provides with respect to minors that:

**Physician or Nurse Shall:**

Place a 72-hour child and Welfare Hold if a parent or legal guardian's decisions to discharge a minor patient against medical advice or their refusal of a treatment significantly threatens a child's health or well-being . . . . A court order to provide a necessary medical procedure or treatment may be necessary.

(*Id*.)

Plaintiffs argue that the Protocol was drafted to sidestep the requirement of parental consent by allowing doctors to request a 72-hour hold and to examine children without consent or court order. The Protocol, Plaintiffs argue, therefore mandates the violation of parental rights under the Fourth and Fourteenth Amendments.

The Court finds and holds that Plaintiffs have not set forth evidence that HCMC's policy and protocol for dealing with minor victims of sexual abuse is constitutionally infirm. Although HCMC's policy allows doctors to request 72-hour olds in certain situations, the policy is consistent with Minnesota law. In particular, Minnesota Statute section 144.344 provides that "[m]edical, dental, mental and other health services may be rendered to minors of any age without the consent of a parent or legal guardian when, in the professional's judgment, the risk to the minor's life or health is of such a nature that treatment should be given without delay and the requirement of consent would result in delay or denial of treatment." Minn. Stat. § 144.344. The Protocol sets up a process for hospital staff to follow when presented with a minor patient who is a premenarchal female or a minor under twelve years of age who presents as a potential victim of pediatric sexual assault or abuse. Plaintiffs have made no showing that the Protocol mandates the violation of parental rights. Further, there is simply no evidence that the policy was the "moving force" behind a constitutional violation here.

Plaintiffs also assert that HCMC engaged in an unconstitutional custom. In support, Plaintiffs assert that the evidence showing a lack of court orders being sought by HCMC staff demonstrates a policy of violating procedural due process rights and Fourth Amendment rights. Despite this general and conclusory allegation, Plaintiffs have failed to set forth any evidence of an unconstitutional custom or practice. As such, summary judgment is appropriate on Plaintiff's *Monell* claims.

### 3. Unilateral Contract

Plaintiffs also state a claim for breach of a unilateral contract with HCMC, asserting that Pauline Thomas entered into a contract with HCMC. In particular, Pauline Thomas claims that she agreed to allow the examination of Jane Doe *if* HCMC agreed to provide her with a copy of the videotape. She alleges that HCMC accepted her offer to allow the examination by conducting the examination of Jane Doe and then breached the contract by refusing to provide records and a copy of the exam. Prior to the first exam, Pauline Thomas handwrote the following note: "I Pauline Thomas am requesting that any interviews or examinations done on [Jane Doe] be video taped and copies be made available to me upon request." (Jane Doe Medical Records at 23.)

The formation of a binding unilateral contract requires an offer, communicated to and accepted by the offeree, and consideration. *Grenier v. Air Express Int'l Corp.*, 132 F. Supp. 2d 1198, 1201 (D. Minn. 2001). Here, there is no definite offer by Pauline Thomas. The note does not place a condition on the examinations or indicate any performance to be done by Pauline Thomas; instead, Pauline Thomas' note simply requests that any interviews or examinations of Jane Doe be videotaped and that copies of the videotapes be made available to Pauline Thomas. The Court holds that Pauline Thomas's claim for unilateral contract fails as a matter of law.

### CI. Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves for partial summary judgment against all Defendants. With respect to their claims against Sergeant Pickhardt, Plaintiffs argue they are entitled to summary judgment on their § 1983 claims for alleged violations of the Fourth and

Fourteenth Amendments; respectively for the alleged unreasonable searches to Jane Doe and John Doe and interference with Pauline Thomas' and Nickole Thomas' right to determine medical care for their children. Plaintiffs also argue that they are entitled to summary judgment on their claims against Murphy and Dr. Tsai for alleged violations of the Fourth and Fourteenth Amendments and on their claims against HCMC under a *Monell* theory for liability under the Fourth and Fourteenth Amendments. For the reasons stated above with respect to the Defendants' motions for summary judgment, the Court denies Plaintiffs' motion for partial summary judgment.

## III.    Motion to Strike

Plaintiffs move to strike certain evidence offered by Defendants as hearsay. The contested evidence includes medical records, police reports, the Lutheran Social Services' Psychosexual Evaluation of R.N.T., the decision of the Minnesota Court of Appeals in *In the Matter of the WELFARE OF R.N.T.*, 2006 WL 696198 (Minn. App. 2006), the Findings and Order for Protective Care and Out-of Home Placement dated July 19, 2004, and the Cornerhouse Interview Synopsis. The Court denies the motion.

First, the medical and police records are not hearsay because they are not offered for the truth of the matter asserted. Fed. R. Evid. 801(c). Instead, they are offered to show what the medical staff and police understood to be the history and medical situation presented on July 14, 2004. Even if the documents constituted hearsay, many would fall within hearsay exceptions. For example, assuming proper foundation, the medical records would fall within Rule 803(4), which covers "statements for purposes of medical diagnosis and treatment." Moreover, the Court considers the Findings and Order for

Protective Care and Out-of Home Placement dated July 19, 2004, only to establish that an emergency protective-care hearing under Minn. Stat. § 260C.178 occurred on July 19, 2004. (McBride Aff. ¶ 33, Ex. 32.)

The Court need not reach the issue of the admissibility of the remaining documents because the Court did not consider them in ruling on the motions before the Court. And even if the documents were considered, the outcome of the present motions would be the same.

## IV.    Motion to Strike Admissions and Motion for Sanctions

The HCMC Defendants, joined by Drs. Tsai and Hogan, assert that Plaintiffs admitted all matters requested in requests for admissions to which the HCMC Defendants contend were served on August 21, 2009, and due on September 23, 2009. Plaintiffs contend that the responses were not due until September 25, 2010, because the calendar of Plaintiffs' counsel and internal e-mails show that the due date was September 25, 2010 and "[t]he responses would never have been calendared for that date if they had not been due on that date." (Pls.' Mem. of Law Filed in Supp. of Their Mot. to Strike or Withdraw Admissions at 2.) Plaintiffs assert that they were diligent and even if they were late by a day, admission is not the appropriate remedy.

Because the Court's ruling on the motions for summary judgment discussed above would not be different regardless of whether the requests for admissions are admitted or not, the Court declines to rule on the motion and strikes the motion from the docket.

Defendants also move for sanctions against Plaintiffs for Plaintiffs' alleged disregard of the rules regarding dispositive motions. Specifically, Defendants assert that

Plaintiffs violated Local Rules 5.1 and 7.1 by filing and serving their memorandum of law in support of their motion for partial summary judgment late and not in accordance with Local Rule 5.1. In addition, Defendants assert that Plaintiffs exceeded the word count limitations in their moving papers. Defendants seek to prohibit Plaintiffs from submitting a reply brief. Plaintiffs respond to the motion for sanctions, not by asserting that the filing was timely and in accordance with local rules, but instead by asserting that Plaintiffs "worked diligently to meet the deadline" and "worked hard all week" to pull the motion papers together. Plaintiffs concede that "Defendants have found a few hairs out of place." The Court denies the motion for sanctions, but notes that it in no way condones the loose adherence to the Federal Rules of Civil Procedure and Local Rules. The Court does not look lightly on the failure to comply with deadlines, service requirements, or word limits and cautions Plaintiffs' counsel to be more careful in the future.

Accordingly, **IT IS HEREBY ORDERED** that:

1.      Plaintiff's Motion for Partial Summary Judgment (Doc. No. [259]) is **DENIED**.

2.      The Motion for Summary Judgment brought by Defendants Dr. Albert Tsai and Dr. Marjorie Hogan (Doc. No. [264]) is **GRANTED.**

3.      The Motion for Summary Judgment brought by Sherrie Murphy, RN, Laura Hauser, William Minor, RN, and Hennepin County Medical Center (Doc. No. [269]) is **GRANTED**.

4.    The Motion for Summary Judgment brought by Sgt. Christopher Pickhardt (Doc. No. [274]) is **GRANTED**.

5.    Defendants' Motion for Sanctions (Doc. No. [289]) is **DENIED**.

6.    Plaintiffs' Motion to Continue Summary Judgment Under Rule 56(f) (Doc. No. [298]) is **DENIED**.

7.    Plaintiffs' Motion to Strike Admissions (Doc. No. [332]) is **DENIED.**

8.    Plaintiffs' Amended Complaint (Doc. No. [187]) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  June 22, 2010                          s/Donovan W. Frank
                                               DONOVAN W. FRANK
                                               United States District Judge